## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LABORERS' PENSION FUND and LABORERS' WELFARE FUND OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, and JAMES S. JORGENSEN, Administrator of the Funds, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 08 C 3393 |
| v. | ) ) | Judge Castillo |
| ALL TIGHT MASONRY, INC., an Illinois corporation, and BRANDON CALDWELL, individually, | ) ) ) ) | |
| Defendants. | ) | |

## MOTION FOR ORDER OF DEFAULT AND TO COMPEL AN AUDIT

Now come Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity and James S. Jorgensen (collectively referred to hereinafter as the "Funds"), by and through their attorney, Patrick T. Wallace, and hereby move for the Order of Default and to Compel an Audit against Defendants All Tight Masonry, Inc. (hereinafter "E B Excavation" or the "Company") and Brandon Caldwell ("Caldwell"). In support of this Motion, Plaintiffs state as follows:

1.    Plaintiffs filed their Complaint on June 12, 2008 seeking to compel the Company to submit benefit reports and contributions from March 2008 forward, obtain and maintain a surety bond in accordance with the terms of the Agreement and to submit its books and records to an audit for the period of September 1, 2006 forward.

2.      Plaintiffs process server attempted to serve Summons and Complaint on the Registered Agent, Daniel Macahon, at the Registered Office listed with the Secretary of State,115 E. Commercial Street, Wood Dale, IL 60191, but there was no office for either Mr. Macahon or All Tight Masonry, Inc. at that address. Accordingly, Plaintiffs served Summons and the Complaint on the Secretary of State pursuant to 805 ILCS 5/5.25 (b)(2) and (c) on December 7, 2005. Summons and Complaint were served on Mr. Caldwell's abode on June 28, 2008. True and accurate copies of Plaintiffs' Affidavit of Service on the Illinois Secretary of State and the Affidavit of Service reflecting service on the abode of Defendant Caldwell are attached hereto as Exhibits A and B respectively.

3.      On June 19, 2008, the Court entered an Order directing Defendants to submit to the requested audit, ordering Plaintiffs to serve the Complaint and exhaust all settlement possibilities, and administratively dismissing the case without prejudice and retaining jurisdiction to enforce the Court's Order or any final judgment order. Plaintiffs forwarded the Court's Order to Defendants on June 23, 2008.

4.      Pursuant to service of Summons and Complaint Defendant Caldwell contacted Plaintiffs' counsel and discussed trying to resolve the case. Further, Defendants submitted payment of the Company's March through June 2008 reports. However, the Company's April 2008 report was rejected due to insufficient funds and the Company has failed to respond to the efforts of Plaintiffs counsel to resolve the case. The Defendants have failed to answer or otherwise plead, and are in default.

5.      Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management

Relations Act ("LMRA"), as amended, 29 U.S.C. §185, the Agreement, and the Funds'

respective Agreements and Declarations of Trust, Defendants should be ordered to submit the

Company' benefit reports and contributions from April 2008 and July 2008 forward, obtain a

surety bond in accordance with the terms of the Agreement and to submit its books and records

to an audit for the period of September 1, 2006 forward.  See Affidavit of Rocco Marcello filed

contemporaneously herewith and attached hereto as Exhibit A, ¶¶ 4-6.

WHEREFORE, Plaintiffs respectfully request that this Court enter and Order finding

Defendants All Tight Masonry, Inc. and Brandon Caldwell in default, ordering The Company to

submit its benefit reports and contributions for the period of April 2008 and July 2008 forward,

obtain and maintain a surety bond, and to submit the Company's books and records to an audit

for the period of September 1, 2006.  Plaintiffs further request that this Court retain jurisdiction

to enter Default Judgment in Sum Certain upon conclusion of the audit including all unpaid

contributions, interest, liquidated damages, audit costs, and Plaintiffs' attorneys' fees and costs

pursuant to the terms of the collective bargaining agreement, the Funds' respective Agreements

and Declarations of Trust, and 29 U.S.C. § 1132(g)(2).

September 6, 2008                                    Laborers' Pension Fund, et al.

                                                    By:  /s/Patrick T. Wallace

Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540
(312) 692-1489 (fax)

| Form **BCA-5.25**<br>(Rev. Jan. 2003) | AFFIDAVIT OF COMPLIANCE FOR SERVICE<br>ON SECRETARY OF STATE UNDER THE<br>BUSINESS CORPORATION ACT | File # 62558881 |
|---|---|---|

| Jesse White<br>Secretary of State<br>Department of Business Services<br>Springfield, IL 62756<br>217-524-6748<br>www.cyberdriveillinois.com | This space for use by Secretary of State.<br><br>**FILED**<br>JUN 2 0 2008<br>**JESSE WHITE<br>SECRETARY OF STATE** | SUBMIT IN DUPLICATE<br><br>Date: 6/20/08<br><br>Filing Fee: $10<br><br>Approved: Jm |
|---|---|---|
| Remit payment in check or money<br>order payable to Secretary of State. | | |

1.  Title and Number of Case:

    Laborers Pension Fund, et al.          first named plaintiff

    v.

    All Tight Masonry, Inc., et al.          first named defendant

    Number  08 C 3393

2.  Name of corporation being served: All Tight Masonry, Inc.

3.  Title of court in which an action, suit or proceeding has been commenced: USDC, N. Dist. E. Div.

4.  Title of instrument being served: Summons and Complaint

5.  Basis for service on the Secretary of State: (check and complete appropriate box)

    a.  ☑  The corporation's registered agent cannot with reasonable diligence be found at the registered office of record in Illinois.

    b.  ☐  The corporation has failed to appoint and maintain a registered agent in Illinois.

    c.  ☐  The corporation was dissolved on _____, _____; the conditions
            Month & Day                                    Year
        of paragraphs (a) or (b) above exist; and the action, suit or proceeding has been instituted against or has affected the corporation within five (5) years thereafter.

    d.  ☐  The corporation's authority to transact business in Illinois has been withdrawn/revoked (circle one) on _____, _____.
            Month & Day          Year

    e.  ☐  The corporation is a foreign corporation that has transacted business in Illinois without procuring authority, contrary to the provisions of the Business Corporation Act of 1983.

6.  Address to which the undersigned will cause a copy of the attached process, notice or demand to be sent by certified or registered mail: D. Macahon, Reg Agt., 115 E. Commercial St., Wood Dale, IL  60191

7.  The undersigned affirms, under penalties of perjury, that the facts stated herein are true, correct and complete.

    _Robert T Wallace_                    June 18                    2008
    Signature of Affiant                  Month & Day               Year

    ( 312 )          692-1540
    Telephone Number

Return to (please type or print clearly):

    Fund Counsel, Laborers Pension Fund
    Name
    111 W. Jackson Blvd., Suite 1415
    Street
    Chicago, IL  60604
    City/Town     State     ZIP

**TENDERED CHICAGO
CORP. DEPARTMENT**

JUN 1 9 2008

ACCEPTANCE AND "FILED" DATE
ESTABLISHED ONLY AFTER
REVIEW

Printed by authority of the State of Illinois. June 2005 — 5M — C 213.10

EXHIBIT
A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LABORERS' PENSION FUND; ET AL** | COURT DATE: |
| PLAINTIFF(S) | Case No.<br>**08 CV 3393** |
| vs. | |
| **ALL TIGHT MASONRY, INC. AND BRANDON CALDWELL** | SERVICE DOCUMENTS:<br>**SUMMONS & COMPLAINT** |
| DEFENDANT(S) | |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Jun 28, 2008, at 9:08 AM,** I served the above described documents upon **BRANDON CALDWELL** as shown below:

**ABODE SERVICE** was made by leaving copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein: **AMY CALDWELL / WIFE.**

Said service was effected at 24442 S PINE RIDGE DR., MONEE, IL 60449

**DESCRIPTION:**  Gender: **F**  Race: **WHITE**  Age: **30**  Hgt: **5'5"**  Wgt: **120**  Hair: **BLONDE**  Glasses: **NO**

I declare under penalties of perjury that the information contained herein is true and correct.

_Karen Crohan_

**Karen Crohan, Lic #: 117-001119**
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 30th day of June, 2008

_Joan C. Harenberg_

```
OFFICIAL SEAL
JOAN C HARENBERG
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/13/09
```

NOTARY PUBLIC

CLIENT NAME:                          ORIGINAL PROOF OF SERVICE                          TRACKING #
**Laborers Pension and Welfare Funds***                                                          3921?
FILE #:

**EXHIBIT
B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND and                    )
LABORERS' WELFARE FUND OF THE                 )
HEALTH AND WELFARE DEPARTMENT                 )
OF THE CONSTRUCTION AND GENERAL               )
LABORERS' DISTRICT COUNCIL OF                 )
CHICAGO AND VICINITY, and JAMES S.            )
JORGENSEN, Administrator of the Funds,        )
                                              )
                      Plaintiffs,             )        Case No.: 08 C 3393
                                              )
        v.                                    )
                                              )        Judge Castillo
ALL TIGHT MASONRY, INC., an Illinois          )
corporation, and BRANDON CALDWELL,            )
individually,                                 )
                                              )
                      Defendants.             )

## AFFIDAVIT OF ROCCO MARCELLO

ROCCO MARCELLO, being first duly sworn on oath, deposes and states as follows:

1.      I am a Field Representative employed by the Laborers' Pension Fund and the

Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago

and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-

referenced action. My responsibilities include oversight of the collection of amounts owed by

Defendant All Tight Masonry, Inc. (hereinafter "All Tight" or the "Company"). This Affidavit is

submitted in support of the Laborers' Funds' Motion for Order of Default and to Compel an

Audit. I have personal knowledge regarding the statements contained herein.

2.      On September 2, 2003, the Company signed an Independent Construction Industry

Collective Bargaining Agreement ("Agreement") with the Construction and General Laborers'

District Council of Chicago and Vicinity ("District Council") and Laborers' Local Union No. 75.



EXHIBIT
C

A true and accurate copy of the Agreement is attached hereto as Exhibit C-1. Pursuant to the terms of the Memoranda, the Company is bound to the terms of the relevant collective bargaining agreements incorporated by reference in the Agreement and the Funds' respective Agreements and Declarations of Trust.

 3. Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

 4. The Agreement and the Funds' respective Agreements and Declarations of Trust to which the Company is bound require that the Company submit benefit reports and contribution payments by the tenth day of the following month. Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 10 percent or 20 percent (after June 1, 2007) of the principal amount of delinquent contributions, and interest at a rate of prime plus 2 percent as charged by the J.P. Morgan Chase Bank, N.A. from the date of delinquency forward. The Agreement and the Funds' respective Agreements and Declarations of Trust also obligate the Company to submit its books and records to the Funds for periodic audits to determine benefit contribution compliance. A copy of the relevant portions of the Agreement are attached as Exhibit C-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund are attached as Exhibit C-3; and a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council are attached as Exhibit C-4.

 5. The Company has failed to submit and pay benefit reports for the period of April 2008 and July 2008 forward. The Company has also failed to submit its books and records to a requested audit for the period of September 1, 2006 forward.

2

6.    The Agreement obligates the Company to obtain and maintain a surety bond to insure payment of future wages, pension and welfare contributions. The Company has failed to obtain and maintain a surety bond in accordance with the terms of the Agreement.

FURTHER AFFIANT SAYETH NOT.

Rocco Marcello

Subscribed and sworn to before me
this ___5th___ day of September 2008.

Notary Public

"OFFICIAL SEAL"
JEANNETTE ZECK
Notary Public, State of Illinois
My Commission Expires 09/13/10

3



# CONSTRUCTION & GENERAL LABORERS'
## DISTRICT COUNCIL OF CHICAGO AND VICINITY
### AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO
101 BURR RIDGE PARKWAY • SUITE 300 • BURR RIDGE, IL 60527 • PHONE: 630/655-8389 • FAX: 630/655-4853

## INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between **Alltight Masonry Inc** ("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO ("Union"), representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092, together with any other Local Unions that may come within the Union's jurisdiction ("Local Union"), and encompassing the geographic areas of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

1. **Recognition.** The Employer, in response to the Union's request for recognition as the majority 9(a) representative of its Laborer employees, and the Union's offer to show evidence of its majority support, hereby recognizes the Union under Section 9(a) of the Act as the sole and exclusive collective bargaining representative for the employees now and hereinafter employed in the Laborer bargaining unit with respect to wages, hours and other terms and conditions of employment without the need for a Board certified election. The Employer has not assigned its rights for purposes of collective bargaining with the Union to any person, entity or association, and hereby revokes its prior assignment of bargaining rights, if any. The Employer further voluntarily elects not to assign such bargaining rights to any person, entity or association during the term of this Agreement or any extension hereof, without written approval from the Union. The Employer shall abide by this Agreement, and extensions hereof, provided that it employs at least one Laborer per year.

2. **Labor Contract.** The Employer affirms and adopts the applicable Collective Bargaining Agreements, as designated by the Union, between the Union and the Builders Association of Chicago and Vicinity, the Illinois Road Builders Association, the Underground Contractors Association, the Mason Contractors Association of Greater Chicago, the Concrete Contractors Association of Greater Chicago, G.O.C.N.V.C.A.W.C.C., the Chicago Demolition Contractors' Association, the Illinois Environmental Contractors Association, the Lake County Contractors Association, the Contractors Association of Will and Grundy Counties, the Fox Valley General Contractors Association, the Chicago Area Rail Contractors Association, the Chicago Scaffolding Association, and all other industry associations with whom the Union or its affiliated Local Unions has an agreement. If the applicable collective bargaining agreement(s) expire during the term of this Agreement, any limitation on the right to strike shall also expire until a new agreement has been established, which shall be incorporated retroactively herein. It is further agreed that where the Employer works within the geographic jurisdiction of the Union's affiliated Local Unions that have negotiated an association agreement effective within the Local Union's jurisdiction, then the Local Union agreement is herein specifically incorporated into this Agreement and shall supersede the area-wide standard association agreements within the locality for which it is negotiated in the case of any conflict between them. Notwithstanding the foregoing, this Agreement supersedes all contrary terms in either the Local Union or area-wide association agreements.

3. **Dues Checkoff.** The Employer shall deduct from the wages of employees uniform working dues in the amount of 1.5% of gross wages, or such other amount as directed by the Union, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list showing the employees from whom dues were deducted, the employees' individual hours, gross wages and deducted dues amount for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made. It is the parties' intention that these deductions comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and such deductions be made only pursuant to written assignments from each employee on whose account such deductions are made, which shall not be irrevocable for a period of more than one year or beyond the termination date of the labor agreement, whichever occurs sooner.

4. **Work Jurisdiction.** This Agreement covers all work within the Union's work jurisdiction as set forth in the Union's Statement of Jurisdiction, receipt of which is hereby acknowledged, and as amended by the Union from time to time. The Statement of Jurisdiction is incorporated by reference into this Agreement. The Employer shall assign all work described therein to its Union-represented Laborer employees and acknowledges the appropriateness of the assignments. Neither the Employer nor its work assignments as required under this Agreement shall be stipulated or otherwise subject to adjustment by any jurisdictional disputes board or mechanism except under written notice by and direction of the Union. The Employer, whether acting as a contractor, general manager or developer, shall not contract or subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work coming within the above-described jurisdiction of the Union to any person, corporation or entity not signatory to and covered by a collective bargaining agreement with the Union. This obligation applies to all tiers of subcontractors performing work at the site of construction. When the Employer contracts out or sublets any of the work coming within the above-described jurisdiction of the Union, it shall assume the obligations of any such subcontractor for prompt payment of employees' wages and other benefits required under this Agreement, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

5. **Fringe Benefits.** The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department of The Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund (including Laborers' Excess Benefit Funds), the Fox Valley Benefit Funds, the Construction and General Laborers' District Council of Chicago and Vicinity Apprentice and Training Trust Fund, the Chicago Area Laborers-Employers Cooperation Education Trust ("LECET"), and to all other designated Union-affiliated benefit and labor-management funds, and to become bound by and be considered a party to the Agreements and Declarations of Trust creating said Trust Funds as if it had signed the original copies of the Trust instruments and amendments thereto. The Employer ratifies and confirms the appointment of the Employer Trustees and their successor Trustees, carry out the terms and conditions of the Trust instruments. The Employer further affirms that all prior contributions paid to the Welfare, Pension and Training Funds were made by duly authorized agents of the Employer at all proper rates, and evidence the Employer's intent to be bound by the Trust Agreements and Collective Bargaining Agreements in effect when the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable agreements. Upon written notice to the Employer, the Union may increase the minimum surety bond to an amount not exceeding one hundred thousand dollars where necessary to ensure Employer compliance with its obligations.

Where Laborers covered by this Agreement perform work outside the Chicago area, the Employer shall, if covered under a local LIUNA-affiliated labor agreement in the area, contribute to the local fringe benefit funds in the amounts set forth in the local agreement. Otherwise, it shall remit all fringe benefit fund contributions in the amounts and to the funds as required under this Agreement.

6. **Wages and Industry Funds.** The Employer shall pay all the negotiated hourly wages, fringe benefit and industry fund contributions it is bound to pay under the applicable Collective Bargaining Agreements, including, where applicable, contributions to the Chicago-Area LECET and designated labor-management and industry advancement funds, except that no contributions shall be made to MCIAF unless connected to and upon written direction from the Union. All additional wage rates, dues checkoff, and fringe benefits that are negotiated or become effective after May 31, 2001 shall be incorporated into this Agreement. The Union expressly reserves its sole right to allocate and apportion each annual total economic increase.

7. **Contract Enforcement.** All grievances arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee for final and binding disposition in lieu of another grievance committee. Should the Employer fail to comply within ten (10) days with any binding grievance award, whether by grievance committee or arbitration, it shall be liable for all costs and legal fees incurred by the Union to enforce the award. Notwithstanding anything to the contrary, nothing herein shall limit the Union's right to strike or withdraw its members because of non-payment of underpayment of wages and/or fringe benefit contributions, failure by the Employer to timely remit dues to the Union, subcontracting in violation hereof, or non-compliance with a binding grievance award. The Employer's violation of any provision of this paragraph will give the Union the right to take any other lawful and economic action, including but not limited to all remedies at law or equity. It is expressly understood and agreed that the Union's right to take economic action is in addition to, and not in lieu of, its rights under the grievance procedures. Where necessary to correct contract violations, or where an acceptable steward is currently employed, the Union may appoint and place a steward from outside the workforce at all job sites.

8. **Successors.** In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph. The Union may strike to enforce the terms hereof.

9. **Termination.** This Agreement shall remain in full force and effect from June 1, 2001 (unless dated differently below) through May 31, 2006, and shall continue thereafter unless there has been given written notice, by certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such notice by the Employer and the Union agree to be bound by the new area-wide negotiated agreements with the various Associations incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements, unless and until timely notice of termination is given as provided above.

10. **Execution.** The Employer acknowledges and accepts the facsimile signatures on this contract as if they were the original signatures. The Employer further acknowledges receipt of a copy of the complete Joint Agreements.

Dated: **9-2** , 20 **03**

ACCEPTED:

Laborers' Local Union No. **75**

By: _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _____
Frank Riley, President & Secretary-Treas.

By: _____
James P. Connolly, Business Manager

For Office Use Only: **CAWGC**

**Alltight Masonry Inc**
(Employer)

FEIN No. **22-3977312**

**Brandon Caldwell, President**
(Print Name and Title)

_____
(Signature)

**1431 Lantern**
(Address)

**Lockport, IL 60441**
(City, State and Zip Code)

**815-836-8096** — **815-836-0076**
(Telephone/Telefax)



EXHIBIT C-1

JUNE 1, 2006 through MAY 31, 2010

A G R E E M E N T

between

**CONTRACTORS' ASSOCIATION
OF WILL AND GRUNDY COUNTIES
REPRESENTED BY THE
MID-AMERICA REGIONAL BARGAINING ASSOCIATION**

and

**LABORERS' LOCAL 75**

**CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY**

**LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA
AFL-CIO**



EXHIBIT
C-2

Flying Forms:  Laborers shall tend the Carpenters when prefabricating the Flying Forms on the ground.

When Flying Forms are used on each floor, Laborers shall assist in the placing of Steel Tubular Scaffolding and Flying Forms.

When Concrete Floors are poured and Flying Forms are removed, Laborers will assist.

Laborers will clean and oil Flying Forms after each concrete pour.
After the last concrete pour, when Flying Forms will not be re-used on jobsite, Laborers will remove, clean and dismantle, oil and place in the stockpile.

Machinery Jurisdiction

Section 3  In any instance where a machine replaces only the work of Laborers, said machine shall be operated by a Laborer, if so determined by the Employer.

There shall be no restrictions as to the use of machinery, tools or appliances, except a regular #2 sand and gravel scoop and nothing larger be used for shoveling sand and gravel.

That there shall be no restrictions as to the use of any raw or manufactured materials, except prison made.

Power Pac:  When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

# ARTICLE V
## WAGES, PENSION, WELFARE
### Wage Classification

Section 1  The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2006 to and including May 31, 2007 shall be as is set forth below for the respective following classifications as further defined herein.  The wage rates include an increase of $2.90 per hour effective June 1, 2006 to May 31, 2007.  June 1, 2007 to May 31, 2008, $3.00 per hour increase to be allocated between wages, fringe benefits, labor-management and industry funds by the Union in its sole discretion.  June 1, 2008,  to May 31, 2009, $3.00 per hour increase to be allocated between wages,  fringe benefits, labor-management and industry funds by the union in its sole discretion.  June 1, 2009,  to May 31, 2010, $3.10 per hour increase to be allocated between wages, fringe benefits, labor-management and industry funds by the union in its sole discretion.  The foregoing allocations may include allocations to LECET and LDC/LMCC.

a. Tunnel Miners, and all laborers inside tunnel, Air-Blow Pipemen, Torchmen (Burners), Mortaring Men on Sewer and drain pipe (the applying of mortar and composition mixes), all bottom men on sewer work all sewer and drain pipe layers Multiple Concrete Duct or

any other type of pipe used on Public Utility work 8 feet or more below ground level, and all other sewer and trench laborers 8 feet or more below ground level regardless of excavation area, all labor work inside Cofferdam, the use of a 10 foot or more drill steel for hand held drills, Caisson Laborers ground level down to 15 feet, all air tools 8 feet or more below ground level, all laborers working on swinging-suspended or any type or make of scaffolds, 48 feet to 100 feet, all Chimney and Silo Laborers working at a height of 48 feet to 100 feet, all tamping hammers over 150 lbs., all laborers working inside of a sphere or any type of make or tank at a height of 48 feet to 100 feet, all Hydraulic, electric and air tools or any other type 8 feet or more below ground level, Vibrators any type 8 feet or more below ground level:

| Effective June 1, 2006: | $31.80 | |
| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

   b.  Chimney and Silo Laborers for every additional 50 feet or any part thereof above 100 feet high shall be paid an additional $1.00 per hour above the wage rate beginning at

| Effective June 1, 2006: | $31.80 | |
| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

   c.  All Laborers working inside of a sphere or any type of tank for every additional 50 feet or part thereof above 100 feet in height shall be paid an additional $.50 per hour above the wage rate beginning at

| Effective June 1, 2006: | $31.80 | |
| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

   d.     Asphalt Rakers, Hod Carriers, Plaster Laborers, Gunite Laborers, Slab for setters on Roads, Highways, Streets, Airport Runways, and Radii (any type of form) stringline men for all aforementioned work, Wagon & Tower drillers on land and floating plant used on dredging, Asphalt Gunners and Plug Men (Undercoating on road work), Mortar Pump Laborers and Plaster Pump Laborers

| Effective June 1, 2006: | $31.75 |

| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

e. Outside Tunnel Miner Helpers, Sewer and drain pipe layers and Multiple Concrete Duct or any other type of pipe used on Public Utility Work, ground level down to 8 feet, Pumpcrete Pipe Handlers, Blasting Men Helpers.

| Effective June 1, 2006: | $31.65 | |

| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

f. Gunite Nozzle Men, Caisson Laborers and all tamping Hammers from 150 lbs. and over, from 15 feet below ground level down to 50 feet

| Effective June 1, 2006: | $32.05 | |

| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

g. All Underground Cavern Laborers, Caisson Laborers 50 feet or more below ground level, Laborers working under radio active conditions (suiting up), Blasting Men (Powdermen)

| Effective June 1, 2006: | $32.40 | |

| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

h. Working Foreman issuing orders to Laborers under section 1-A, B, C, D, E, F, & G shall receive an increase of fifty cents (50¢) per hour above the wages set forth therein. Minimum wage

| Effective June 1, 2006: | $32.05 | |

| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

i. Non-Working Foreman issuing orders to Laborers under section 1- A, B, C, D, E, F, & G shall receive one dollar ($1.00) per hour above the wages set forth therein.  Minimum wage

Effective June 1, 2006:        $32.55

Effective June 1, 2007:        $3.00        to be allocated between wages and
Effective June 1, 2008:        $3.00        fringe benefits by the Union
Effective June 1, 2009         $3.10        in its sole discretion. (See above paragraph)

j. General Labor Foreman shall receive two dollars ($2.00) per hour above the wages set forth therein.

Effective June 1, 2006:        $33.55

Effective June 1, 2007:        $3.00        to be allocated between wages and
Effective June 1, 2008:        $3.00        fringe benefits by the Union
Effective June 1, 2009         $3.10        in its sole discretion. (See above paragraph)

A Union Member issuing orders to one or more General Foremen

Effective June 1, 2006:        $34.15

Effective June 1, 2007:        $3.00        to be allocated between wages and
Effective June 1, 2008:        $3.00        fringe benefits by the Union
Effective June 1, 2009         $3.10        in its sole discretion. (See above paragraph)

k. Mortar Mixers, handling asphalt shingles, patented scaffolds, sewer and trench ground level down to 8 feet, Catch Basin and Manhole Diggers, mesh handling on road work, Cement and Mineral Filler Handler, Concrete Puddlers, Batch Dumpers, (cement & asphalt), Vibrator Operators, Sand and Stone Wheelers, to Mixer, (Handlers), Concrete Wheelers, Air-tamping Hammermen, Concrete and Paving Breakers, Rock Drillers, jackhammermen, Chipping Hammermen, 1-Bag Mixer, Asphalt Laborers, chain and power saws, Pit Men, all fence Laborers, Mason Tenders, (Mortar & Brick Wheeler), Wagon & Tower drill helpers, Kettlemen and Tarmen, Tank Cleaners, Scaffold & Staging Laborers, Pot Firemen, (Tarmen), Heater Tender for any purpose, water pumps, (Portable Water Pumps shall be tended by Laborers if the Employer determines tending is required), rip rap, Electrician, Plumber and Finisher Helpers (minimum), handling of slab steel road forms in any manner, except road form setting, setting center strips, contraction and expansion joints (road work), unloading and handling thereof of the following: Lumber, brick, transite materials, cast iron water pipe, reinforced concrete rods, sewer and drain tile, railroad ties and all other creosoted materials, paving blocks and concrete forms, handling of insulation of any type, all work involving the unloading of materials, fixtures, or furnishings whether crated or uncrated, all mortar and composition mixers of sewer work, track

Laborers, Chimney and Silo Laborers working at a height of 1 to 48 feet, all Laborers working on swinging, suspended, or any type or make of scaffolding 1 foot to 48 feet, all Laborers working inside a sphere or any type of make of tank minimum rate, all Laborers working inside a sphere or any type or make of tank from bottom to a height of 48 feet minimum rate, form strippers (any type) Mechanical or motorized buggies, for concrete or masons Employers, the use of skid steer loads and forklifts or any other machinery which replaces the wheelbarrow or buggy, handling multiple concrete duct or any other type of pipe used in Public Utility work unless otherwise specified herein, snapping of Wall ties and removal of rods, drilling of Anchor Bolt Holes, concrete or asphalt clipper type saws and self-propelled saws, Shoulder and Grade Laborers, all hydraulic electric and air or any other type of tools, grouting and caulking, carpenter helpers, cleaning lumber, nail pulling, deck hand, dredgehand, shore Laborers, Bankmen on Floating Plant, Tool and Material Checkers, (on a job site requiring a Tool Shanty, said Tool Shanty shall be tended by a Laborer if the Employer determines tending is required), Signalmen and Flagmen on all construction work defined herein, cleaning of debris, removal of trees, concrete curing, temporary concrete protection, regardless of manner or materials used, tuck helpers, Laborers on Apsco, Janitorial Service, Wrecking and Demolition Laborers, all landscaping, laying of sod, planting of trees.

| | | |
|---|---|---|
| Effective June 1, 2006: | $31.55 | |
| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

1. Non-Working Watchman only: A work week shall begin Monday and shall end Sunday. All hours worked by non-working Watchmen in excess of 40 hours per week shall be paid for at the rate of time and one-half the straight time rate. Double time shall be paid as stipulated in Article VI, Section 3, except Sunday and all Fringe Benefits as set forth in Article V, Section 2

| | | |
|---|---|---|
| Effective June 1, 2006: | $28.80 | |
| Effective June 1, 2007: | $3.00 | to be allocated between wages and |
| Effective June 1, 2008: | $3.00 | fringe benefits by the Union |
| Effective June 1, 2009 | $3.10 | in its sole discretion. (See above paragraph) |

m. Working Watchmen: All of Article V and VI shall be applicable to this employee and therefore shall be paid accordingly.

n. Dosimeter Use. A premium of $1.00 per hour shall be aid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument of measuring device.

o.  Asbestos Use.  A premium of $1.00 per hour shall be paid to any Laborer required to work with asbestos, who is a certified asbestos Laborer who is licensed by the State of Illinois as an Asbestos Abatement worker.  Any equipment necessary to perform work or physical examination required by the Employer will be paid for by the Employer.

p.  Material Testing/Quality Control Laborers – see side letter

q.  APPRENTICE COMMITTEE: The Employer hereby agrees that the Laborers  Joint Apprenticeship Training Committee (JATC) shall have the authority to establish rules for the apprentice program, including penalties for violations of the apprenticeship rules, which are incorporated herein by reference.

APPRENTICE PROGRAM FUNDING:  The apprenticeship program administered by the JATC shall be self sustaining.  In addition to the sums set forth in Article IX, Paragraph 2 of the Agreement, effective June 1, 2006,  the Employer shall also contribute to the Training Fund an additional contribution of five cents ($.05) per hour for each hour worked by all employees covered by this agreement to the Training Fund or to a designated appointee at the end of each month, and such additional sums as the Union may designate in its sole discretion from the total economic package on June 1, 2007, 2008, and 2009 under this Agreement..

The term of apprenticeship shall be 2,400 hours, or two years, whichever occurs later, or such other duration as is mutually agreed by the Training and Apprenticeship Fund trustees.  All Health and Welfare, Pension, training Fund Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice.  Union affiliation will be required after seven (7) days of employment.

The wages per hour paid to apprentices shall be as follows:

1st six (6) months: 60% of journeyman (base) wages ($18.93)

2nd Six (6) months: 70% of journeyman (base) wages ($22.085)

3rd Six (6) months: 80% of journeyman (base) wages ($25.24)

4th Six (6) months: 90% of journeyman (base) wages ($28.395)

After 24 months: 100% of journeyman (base) wages ($31.55)

The ratio of journeymen to Apprentices shall be six (6) laborer journeymen to one (1) laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of laborers being apprentices on any one job site of the Employer.  Employers who employ a maximum of between one (1) and five (5) laborer journeymen shall be entitled to one (1) laborer apprentice, who may be assigned to job sites irrespective of the twenty percent (20%) job site maximum specified in this provision.

Referral of apprentices will be through the Local Union with jurisdiction over the job site. Employers requesting apprentices will be assigned an apprentice from the available JATC apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios established by the JATC. All apprentices must report their hours weekly to the JATC. All apprentices will be tested for the presence of illegal substances at the time they enter the apprentice program.

## Welfare and Pension

Section 2 a. Welfare. Beginning June 1, 2006 the Employer agrees to make Health and Welfare contributions of $7.46 cents per hour for each hour worked by all Employees covered by this Agreement in addition to the wages herein stipulated. This $7.46 cents per hour shall be paid to the Health and Welfare Department of the Construction and General Laborers District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009; June 1, 2009 to May 31, 2010; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension, Training, Labor-Management and Industry Funds to be allocated from the economic package for that year. (See Article V, Section 1).

b. Pension. Beginning June 1, 2006, the Employer agrees to make a pension contribution of $4.84 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $4.84 per hour shall be paid to the Laborers Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009; June 1, 2009 to May 31, 2010; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension, Training, Labor-Management and Industry Funds to be allocated from the economic package for that year. (See Article V, Section 1).

The Union will allocate a minimum of fifty-cents ($ .50) per hour from the total economic increase over the contract term, which includes twenty cents ($ .20) per hour in the first contract year, which will be dedicated only toward reduction in the Laborers' Pension Fund unfunded liability and will not be used to fund benefit improvements. The foregoing does not limit the allocation of additional contributions for increased benefits based on actuarial cost projections.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Fund, or to the Vacation Fund when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to Ten (10%) Percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of Ten (10%) Percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at the maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees place the account in the hands of legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys fees shall mean: All reasonable attorneys fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contribution and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys fees. The Trustees authority to waive any costs shall be governed by the terms of the Trust Agreement.

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' affiliated Welfare Fund, Pension Fund and Training Fund, and all amendments thereto, and agrees to be bound by all actions taken by the Trustees of those funds pursuant to the Agreements and Declarations of Trust of those funds.

Article III Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time employees of Contributing Employers within the Association's membership. A Contributing Employer shall be defined as an Employer that has employed an average of five (5)

or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

The parties agree that the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund will be operated and administered by a board of trustees that is expanded to include 8 employer and 8 union trustees. Appointing authority for the two additional employer trustees shall be vested with new employer associations that currently are not party to the trust agreements and under whose labor agreements more than 20,000 hours of benefits were paid in 2005.

**Chicagoland Laborers' Vacation Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter layoffs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Chicagoland Laborers' Annuity Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Out of Town Work.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are asked to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement.

**Special Rules for Bonding.** An employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an amount equal to twice the amount of the other contributing employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

### Excess Benefit Fund

A Section 415 Excess Benefit Fund shall be established for the purpose of providing

alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.    The Employer agrees to be bound by the Agreement and Declaration of Trust establishing Excess Benefit Fund, and all amendments thereto, and agrees to be bound by all actions taken by the Trustees of those funds pursuant to the Agreement and Declaration of Trust of those funds.

## Check-Off and Dues Deductions

Section 3  Employers also agree to deduct from the net earnings payable to an Employee covered by this Agreement, initiation fees and quarterly non-working Union dues insofar as permitted by state and federal laws upon receipt and in accordance with a duly executed authorization form from the Employees.  Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

Employers covered by this Agreement shall deduct from the wages of Employees covered by said contract, working dues in the amount established from time to time by the Union for each hour worked and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made.

The Union will submit to the Employer a written statement of respective amounts of initiation fees and union dues due the Union.  The Employer will then deduct said amount from each Employee's pay every weekly pay period until the total amount of initiation fees and dues have been deducted.  Deductions from the weekly wages shall be not less than Twenty-five ($25.00) Dollars per week to apply to initiation fees and dues until fully paid.

Deductions shall be remitted to the Union or to a designated appointee by the Employer promptly, and the Local Union shall acknowledge receipt of the money.  The Employer shall furnish the Union with a record of those for whom deductions have been made, the amount of the deductions, and a list of absentees.

Employees may authorize deductions of more than the aforesaid Twenty-five ($25.00)

Dollars per week, if they so desire, in order to complete early payment of initiation fees and quarterly dues.

It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on whose account such deductions are made, which assignment shall not be irrevocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys fees on behalf of the beneficiaries of such indemnity.

Should the Employer fail to remit check-off dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including audit expenses and attorney fees and costs. Dues remittance reports shall include a report of the hours worked and wages earned by each Laborer. Employers who fail to timely remit Union dues shall be assessed an additional ten percent (10%) liquidated damages. The Union may audit the Employer to monitor its compliance with this article.

The Union may file suit, or withdraw its members, or both for non-remittance or underpayment of dues.

### Industry and Safety Funds

Section 4  Each Employer shall pay into the WILL-GRUNDY INDUSTRY ADVANCEMENT TRUST (hereinafter sometimes referred to as the Industry and Safety Fund ) in the amount of $.08 for each hour worked for the Employer by those of his Employees covered by this Agreement. In the alternative, if the CAWGC directs, each Employer shall pay to the Mid-America Regional Bargaining Association Industry Advancement Fund (hereafter sometimes referred to as the "Industry Fund"), in the amount of $ .08 for each hour worked for the Employer by those of his Employees covered by this Agreement.

The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Industry Fund as well as any amendments thereto and agrees to be bound by all actions taken by the Trustees of said Industry Fund pursuant to said Agreement and Declaration of Trust and amendments thereto.

Inasmuch as the existence and utilization of this Industry Fund should result in increased construction and, therefore, in increased construction job opportunities for employees the Union agrees to cooperate in assuring that the contributions required are in fact made by Employers bound by this Agreement.

During the term of this Agreement, it shall be at the discretion of the Employer Association to name an alternate industry fund to that of the W.G.I.A.T. The Association shall notify the Union when it exercises its option to choose an alternate industry fund.

Each Employer shall pay the amount of five cents ($ .05) for each hour worked by those employees covered under this Agreement to the Chicago-area Laborers-Employers Cooperation Education Trust ( LECET ).

Each Employer shall pay the amount of twelve cents ($ .12) for each hour worked by those employees covered under this Agreement to the Laborers' District Council Labor-Management Cooperation Committee ("LDC/LMCC")

The Employer agrees to be bound by the Agreement and Declaration of Trust establishing LECET and the LDC/LMCC, and all amendments thereto, and agrees to be bound by all actions taken by the Trustees of those funds pursuant to the Agreement and Declaration of Trust of those funds.

Should any Employer fail to make payments to the Industry and Safety Fund,  LECET or LDC/LMCC Fund, the Employer shall be liable for and pay, in addition to the delinquent contributions, interest at a rate of ten percent (10%) per year for such delinquencies, and to pay all costs of collection, including audit expenses and attorney fees and costs.

### Foreman and General Foreman

Section 5 Where there are three (3) to six (6) Laborers employed on a job, one Laborer shall be a working Foreman; where there are seven (7) or more Laborers employed on a job, one (1) Laborer shall be a non-working Foreman.  The Employer may select a working or a non-working Foreman from the group of Laborers to supervise in the above mentioned.  The Employer may advance the working Foreman to a non-working Foreman if he so desires.

This Agreement shall not include the supervisory forces classed as clerical employees; timekeepers, superintendents, master mechanics or general labor foreman.  In the event that the Employer desires to employ a General Labor Foreman who is a member of the Union his wages shall not be less than stipulated herein.

A General Labor Foreman is considered as such when he issues orders to one or more Labor Foreman.  In the event that the Employer desires to employ a Union Member who issues orders to one or more General Labor Foremen his wages shall not be less than as stipulated herein.

### Composite Crews

Section 6 It is agreed that where composite crews are worked, and the Crafts are doing each others work the Laborers wages shall not be less than those received by the Carpenters.  If Carpenters are not employed in these composite crews it will be at the option of the Union to

# RESTATED AGREEMENT

### AND

# DECLARATION OF TRUST

#### CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002



EXHIBIT
C-3

(b)    To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)    To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

Section I.    IN GENERAL.  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work.  No

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. <u>DEFAULT IN PAYMENT OF CONTRIBUTIONS.</u> Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3.    <u>REPORT   ON   CONTRIBUTIONS AND PRODUCTION OF RECORDS.</u> The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees. on demand. the names of its employees, their social security numbers, the hours worked by each employee, and such

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

## FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.    FILING OF A CLAIM.    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.   Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.   Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.   Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.   Cash disbursement journals and general ledgers.

5.   Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.   Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.   Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.   Daily time records filed by employees or supervisors.

9.   Source documents and lists of job codes and equipment codes.

10.   Certified payrolls for public sector jobs where such payrolls are required.

11.   Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

## LABORERS' PENSION AND WELFARE FUNDS

### POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

## LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

1

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**.  If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit.  An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**.  Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods.  If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**.  Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

May-09-2007  12:25pm   From-Laborers'Pen & Wel Funds              +              T-351  P.002/009  F-615

## AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":

"Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)    EMPLOYER OWNED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    EMPLOYER OPERATED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

  (c) <u>PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.</u>  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund.  The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

  (d) <u>MISCELLANEOUS PROVISIONS.</u>  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

III.

  <u>Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.</u>

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| | | | |
|---|---|---|---|
| _(signature)_ | 9-18-06 | _(signature)_ | 9/13/06 |
| **CHARLES COHEN** | **DATE** | **JOSEPH COCONATO** | **DATE** |
| _(signature)_ | 9/18/06 | _(signature)_ | 9/18/06 |
| **ALAN ESCHE** | **DATE** | **JAMES P. CONNOLLY** | **DATE** |
| _(signature)_ | 9/18/06 | _(signature)_ | 9/18/06 |
| **ROBERT G. KRUG** | **DATE** | **J. MICHAEL LAZZARETTO** | **DATE** |
| _(signature)_ | 9/18/06 | _(signature)_ | 9/18/06 |
| **RICHARD E. GRABOWSKI** | **DATE** | **FRANK RILEY** | **DATE** |
| _(signature)_ | 9/18/06 | _(signature)_ | 9/18/06 |
| **DAVID H. LORIG** | **DATE** | **LARRY WRIGHT** | **DATE** |
| _(signature)_ | 9/18/06 | _(signature)_ | 9-18-06 |
| **GARY LUNDSBERG** | **DATE** | **JEFF ZIEMANN** | **DATE** |

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003



EXHIBIT
C-4

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund.    The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs.  The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees.  At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject.   In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency.  The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3.   REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS.
The Employers shall make all reports on contributions required by the Trustees.  Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust.  The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports.   All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records.  The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive.  Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

16

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.   Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.   Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.   Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.   Cash disbursement journals and general ledgers.

5.   Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.          .

6.   Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.   Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.   Daily time records filed by employees or supervisors.

9.   Source documents and lists of job codes and equipment codes.

10.   Certified payrolls for public sector jobs where such payrolls are required.

11.   Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

1

12.  Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13.  If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above.  However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above.  In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.  The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

## LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers.** New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

**4. Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

**1. New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

**2. Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

**3. Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

**4.** Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

AMENDMENT TO THE
RESTATED AGREEMENT AND DECLARATION OF TRUST
OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND
GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

1

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

The following is added as Section (4) to Article VI, "Employer Contributions":

"Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)    EMPLOYER OWNED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    EMPLOYER OPERATED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)    PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund.  The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)    MISCELLANEOUS PROVISIONS.  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

## III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

CHARLES J. GALLAGHER _____ DATE

JAMES P. CONNOLLY _____ 9/19/06 DATE

ALAN ESCHE _____ 9/19/06 DATE

RANDY DALTON _____ 9/19/06 DATE

RICHARD E. GRABOWSKI _____ 9/19/06 DATE

MARTIN FLANAGAN _____ 9-19-06 DATE

DAVID H. LORIG _____ 9/19/06 DATE

LIBERATO NAIMOLI _____ 9/19/06 DATE

DENNIS MARTIN _____ 9/19/06 DATE

SCOTT PAVLIS _____ 9/19/06 DATE

TIM J. SCULLY _____ 9/19/06 DATE

FRANK RILEY _____ 9/19/06 DATE

4

## **CERTIFICATE OF SERVICE**

The undersigned certifies that he caused a copy of the foregoing Motion for Order of Default

and to Compel an Audit to be served upon the following persons via mail this 6th day of September

2008.

All Tight Masonry, Inc.
c/o Daniel A. Macahon, Registered agent
115 E. Commercial Street.
Wood Dale, IL  60191

Brandon Caldwell
24442 S. Pine Ridge Drive.
Monee, IL  60449


/s/ Patrick T. Wallace

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | | |
|---|---|---|---|
| LABORERS' PENSION FUND, et al, | ) | | |
| Plaintiffs, | ) | Case No.: 08 C 3393 | |
| v. | ) | | |
| | ) | Judge Castillo | |
| ALL TIGHT MASONRY, INC., an Illinois | ) | | |
| corporation, and BRANDON CALDWELL, | ) | | |
| individually, | ) | | |
| Defendants. | ) | | |

## ORDER

This matter having come to be heard on the Motion of Plaintiffs Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity and James S. Jorgensen, Administrator of the Funds ("Funds'') Order of Default and to Compel an Audit, due notice having been given, and the Court being fully advised in the premises,

**IT IS HEREBY ORDERED**:

1.    That Defendants All Tight Masonry, Inc. ("All Tight" or the "Company") and Brandon Caldwell are in default.

2.    Defendants are directed to promptly submit the Company's books and records for an audit by the Funds for the period of September 1, 2006 forward.

3.    The Company is ordered to obtain and maintain a surety bond in accordance with the terms of its Agreement with the Construction and General Laborers' District Council of Chicago and Vicinity.

4.    The Company is directed to submit and pay contribution reports for the period of April 2008 and July 2008 forward.

FURTHER, the Court retains jurisdiction to enter judgment in sum certain upon the

completion of the audit, plus attorneys' fees and expenses and such other and further relief as may be just and appropriate.

ENTER:

_____
The Honorable Judge Ruben Castillo
United States District Court Judge

Dated:_____